**Occupy Public Land**
**3054 N. Edith Bvld.**
**Tucson, Ariz. 85716**
John Thomas Cooper, Jr.
Executive Organizer
Secretarial Working Group
E-Mail: southwestrecords@gmail.com
Phone: (520) 818-8734

Jon McLane
Chief Executive Organizer
Field Outreach Working Group
E-Mail: jonathanmclane@yahoo.com
Phone: (520) 329-9192



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

JON MCLANE, et. al.,

      Plaintiffs,

  vs.

CITY OF TUCSON, et. al.,

      Defendants.

Case No.: 4:15-CV-13-JAS

**MOTION FOR ORDER TO SHOW CAUSE RE: REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

      Pursuant to Rule 65 of the Federal Rule of Civil Procedure, Plaintiffs hereby move the Court to order Defendant City to Show Cause why a Temporary Restraining Order and Preliminary Injunction, enjoining the City of Tucson, its agents and employees from applying or enforcing Tucson City Code §§ 16-35 or 25-51 against Plaintiffs or others similarly situated should not immediately issue. These ordinances are unconstitutionally vague and their application violates the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs have and will continue to suffer irreparable injury from the application of these ordinances without intervention from the Court. This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. Facts and Procedural History

On June 14th, 2015, the Tucson Police promulgated a new policy of enforcement against homeless citizens to arrest and confiscate their property if they reside on the City sidewalks. The Police issued a memorandum which stated two City Code Sections as applicable to the conduct of the homeless population with respect to City sidewalks:

> Sec. 16-35 provides: "No person shall obstruct any public sidewalk, street or alley in the city by placing, maintaining or allowing to remain thereon any item or thing that prevents full, free and unobstructed public use in any manner, except as otherwise specifically permitted by law."

> Sec. 25-51 provides: "No person shall obstruct any public sidewalk in the city, by placing, depositing or allowing to remain thereon, any boxes, crates, goods, wares, merchandise, hay, grain, farm produce or other thing, or prevent, in any manner, the full, free and unobstructed public use of any of the public sidewalks, . . . "

*Cooper's Declaration* at pp. 3-4; ¶8 and Exhibit 2. This memorandum further stated that "unattended property shall be considered abandoned and subject to immediate removal by the City of Tucson." *Id.*

As these ordinances apply to sidewalks City-wide, Plaintiffs and those similarly situated are faced with an impossible Hobson's choice: never keep or maintain personal property in an amount more than what they can carry on their person or leave the jurisdiction. *Cooper's Declaration* at pp. 2, 3-4; ¶¶ 3, 8, 10-11. Furthermore, Plaintiffs and those similarly situated must decide whether to leave property unattended and risk losing it to the government as "abandoned" or forgo using critical services and restroom facilities (compounding the risk of arrest as relieving one's self in public is a criminal offense)—such as those provided by the County Library, the Courts, City Hall, County Administration, Adult Probation,

-2-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

Adult Parole, DES, Social Security, Arizona Dept. of Revenue, United States Dept. of Internal Revenue, Arizona Dept. of Transportation Motor Vehicle Division, local colleges, local hospitals, etc.—which bar individuals from bringing 'large' amounts of property into their establishments. *Cooper's Declaration* at pp. 2, 3-4; ¶¶ 4-6, 11-12 and Exhibit 1. As stated in Plaintiff Cooper's Declaration:

> Without immediate action from the Court, 100s of homeless people—myself included—face certain confiscation of their personal possession as soon as they succumb to the need to use services provided by establishments which require them to leave their property outside. We are forced to live in fear and uncertainty as being arrested for sleeping with, sitting with, or storing property in public is a constant threat.

*Cooper's Declaration* at p. 5; ¶14.

## 2. Legal Standards

The purpose of a temporary restraining order or a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citations omitted).

In *Winter*, the Court explained:

> The Ninth Circuit's "possibility" standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

an injunction. . . . Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

*Id*. at 22-23 (emphasis added).

"[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted) (finding Ninth Circuit's "sliding scale" approach still viable after *Winter* so long as plaintiff satisfies all four preliminary-injunction prongs).

In clarifying the need to satisfy the four-part *Winter* test, the Ninth Circuit stated that "[t]o the extent prior cases applying the `serious questions' test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, *which requires the plaintiff to make a showing on all four prongs*." *Cottrell*, 632 F.3d at 1135 (citations omitted) (emphasis added).

## 3. Argument

### A. *Plaintiffs Have a Strong Likelihood of Success on the Merits.*

<u>Confiscation of Homeless Citizens' Unattended Property as "Abandoned" Violates the Fourth and Fourteenth Amendments as a Matter of Law.</u>

#### (a) The Fourth Amendment

Although the memorandum issued by the City states that unattended property shall be considered abandoned and subject to immediate removal, the definition of abandoned does not include leaving your property in a particular area

-4-

unattended. Abandonment is "the act of intentionally and voluntarily relinquishing a known right absolutely and without reference to any particular person or purpose." *Mason v. Hasso*, 90 Ariz. 126, 129, 367 P.2d 1, 4 (1961). Forfeiture, on the other hand, "is enforced and involuntary and occurs without regard to intention." *Id*. Indeed, even when arrests are made the government cannot simply declare the property abandoned. See, e.g., A.R.S. § 13-904(D) ("The conviction of a person for any offense shall not work forfeiture of any property, except if a forfeiture is expressly imposed by law. All forfeitures to the state, unless expressly imposed by law, are abolished."); A.R.S. § 31-228(A) ("When a prisoner is released on parole or discharged from a facility of the department of corrections there shall be returned to the prisoner everything of value taken upon commitment to the department of corrections, or thereafter received by the prisoner."); *Blum v. State, Dept. Of Corrections*, 829 P.2d 1247, 171 Ariz. 201 (1992).

The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when the government intrudes upon an expectation of privacy that society is prepared to consider reasonable. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). Plaintiffs need not show a reasonable expectation of privacy to enjoy the protection of the Fourth Amendment against seizures of their unabandoned property. The constitutional standard is whether there was "some meaningful interference" with Plaintiffs' possessory interest in the property.[1]

---

[1] Even if the standard were 'a reasonable expectation of privacy', Plaintiffs' note that their expectation of privacy in their unabandoned shelters and effects may well be reasonable. When determining whether an expectation of privacy is reasonable, "we must keep in mind that the test of legitimacy is . . . whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *California v. Ciraolo*, 476 U.S. 207, 212,

-5-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

The 9th Circuit has recognized that a reasonable expectation of privacy is not required to trigger Fourth Amendment protection against seizures. In *Miranda v. City of Cornelius*, 429 F.3d 858, 862 n.2 (9th Cir. 2005), the plaintiffs admitted that they had no reasonable expectation of privacy in their parked car, but they nevertheless challenged the city's impoundment of the vehicle as an unreasonable seizure. The Court held that the seizure was subject to the Fourth Amendment's reasonableness standard because "[t]he Fourth Amendment protects against unreasonable interferences in property interests regardless of whether there is an invasion of privacy." *Id.* at 862[2]; *Lavan v. City of Los Angeles*, 693 F.3d 1022,

---

106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986) (quotation omitted). In *Silverman v. United States*, the Court explained the "very core" of the Fourth Amendment:

> A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.

365 U.S. 505, 511 n.4, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961) (quoting *United States v. On Lee*, 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, J., dissenting)). As our sane, decent, civilized society has failed to afford more of an oasis, shelter, or castle for the homeless of Tucson than their personal blankets, it is in keeping with the Fourth Amendment's "very core" for the same society to recognize as reasonable homeless persons' expectation that their blankets are not beyond the reach of the Fourth Amendment. See generally, *State v. Mooney*, 218 Conn. 85, 588 A.2d 145, 161 (Conn. 1991) ("The interior of [the homeless defendant's duffel bag and cardboard box] represented, in effect, the defendant's last shred of privacy from the prying eyes of outsiders, including the police. Our notions of custom and civility, and our code of values, would include some measure of respect for that shred of privacy, and would recognize its assertion as reasonable under the circumstances of this case.").

[2] Although Plaintiffs may violate City Code by momentarily leaving unabandoned property on the sidewalks, the seizure and destruction of property remains subject to the Fourth Amendment's reasonableness requirement. Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property. Were it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment. Indeed, the Supreme Court has recognized protected possessory interests even in contraband: In *United States v. Jacobsen*, the Court found that the government's testing of illegal cocaine (which resulted in the destruction of a portion of the cocaine) was a "seizure" that "affect[ed] respondents' possessory interests protected by the [Fourth] Amendment, since

-6-

1024 (9th Cir. 2012) (government seizure and summary destruction of homeless individuals' "unabandoned," but momentarily unattended, personal property violates Fourth and Fourteenth Amendments).

*(b) The Fourteenth Amendment*

1.) Due Process

As stated in the Police memorandum cited above, "[o]bsturcting sidewalks by placing items that prevent the public's full and free use violates [TCC] Sections 16-35 and 25-51." According to several officers Plaintiffs questioned, this means either—(1) Individuals are not allowed to have any property what-so-ever on the Downtown sidewalks; (2) Individuals are allowed a bed roll, backpack, and a beverage (the fact that the District Court in *Cooper v. City of Tucson* ruled the 3-B policy unconstitutional was lost on the two officers who stated this as City Policy); or (3) Individuals are allowed only the amount of property which they can carry in one trip. The fact that these three positions cannot be reconciled evinces the constitutional infirmity of the statutes under question here.

First, in the Ninth Circuit the Fourteenth Amendment protect homeless persons from government seizure and summary destruction of their "unabandoned," but momentarily unattended, personal property. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1024 (9th Cir. 2012). "Because homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth

---

by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one." 466 U.S. at 124-125. Moreover, the Fourth Amendment protected the cocaine from unreasonable seizures despite the lack of any reasonable expectation of privacy in concealing the contraband nature of the powder. See *id.* at 123 ("Congress has decided . . . to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine . . . compromises no legitimate privacy interest.").

-7-

Amendment, the City must comport with [] due process requirements if it wishes to take and destroy them." *Id.* at 1032.

Moreover, both statutes are void for vagueness as they fail to provide a workable definition of the word "obstruction" or the phrase "full, free and unobstructed public use." As patently demonstrated above, not even two law enforcement officers charged with the enforcement of the City Code could agree on the meaning of these statutes.

As the United States Supreme Court has noted on numerous occasions, "[T]he terms of a penal statute [...] must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties... and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926).[3]

---

[3] This analysis should come as no surprise to the City, as the District Court in *Cooper v. City of Tucson* warned its attorneys that these laws were precariously written:

> [T]he City misses the important point that it needs the 3-B Policy because obstruction is not defined in the ordinances it seeks to rely on here: TCC §§ 16-35 and 25-51. See Desertrain v. City of Los Angeles, 754 F.3d 1147, 1155-56 (9th Cir. 2014) (describing statute as unconstitutionally vague if it leaves the public uncertain as to the conduct it prohibits or encourages arbitrary or discriminatory enforcement). "If a statute provides 'no standards governing the exercise of . . . discretion,' it becomes 'a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" Id. (quoting Papachristou v. Jacksonville, 405 U.S. 156, 170 (1972)). Except for the express 5 foot/8 feet standards provided for in TCC § 11-36.2(b)(4) when the sidewalks are being used in the daytime for First Amendment activities, the TCC sidewalk ordinances contain no standards nor definition for "obstruction." The City ignores an express standard, provided by the City Council for applying to all First Amendment activities conducted downtown during the day, in favor of defining "obstruction" pursuant to the 3-B Policy, which appears uniquely tailored to homeless people.

*Cooper v. City of Tucson*, CV 12-208 TUC DCB (D. Ariz. 2015) (Doc. #90, pp. 8-9).

-8-

Additionally, the failure to include a *mens rea* component in TCC Section 16-35 renders the statute and its application nearly indistinguishable from the law invalidated by the United States Supreme Court in *Cox v. Louisiana*, 379 U.S. 536 (1965). In *Cox*, the Court was faced with the following statute:

> "No person shall willfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein."

La. Rev. Stat. § 14:100.1 (Cum. Supp. 1962). The Court noted that vague terms in the statute rendered it susceptible to abuse. The Court stated:

> [t]he situation is thus the same as if the statute itself expressly provided that there could only be peaceful parades or demonstrations in the unbridled discretion of the local officials. The pervasive restraint on freedom of discussion by the practice of the authorities under the statute is not any less effective than a statute expressly permitting such selective enforcement. A long line of cases in this Court makes it clear that a State or municipality cannot "require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be . . . disseminate[d] . . . ." *Schneider v. State, supra*, at 164. See *Lovell v. Griffin, supra*; *Hague v. CIO, supra*; *Largent v. Texas, supra*; *Saia v. New York, supra*; *Niemotko v. Maryland, supra*; *Kunz v. New York, supra*.
>
> This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor. See *Saia v. New York, supra*, at 562. Also inherent in such a system allowing parades or meetings only with the prior permission of an official is the obvious danger to the right of a person or group not to be denied equal protection of the laws. See *Niemotko v. Maryland, supra*, at 272, 284; cf. *Yick Wo v. Hopkins*, 118 U.S. 356. It is clearly unconstitutional to enable a

-9-

public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power *or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.*

*Cox v. Louisiana*, 379 U.S. 536; 85 S. Ct. 453; 13 L. Ed. 2d 471 (1965) (emphasis added). See also *Bachellar v. Maryland*, 397 U.S. 564, 571, 25 L. Ed. 2d 570, 90 S. Ct. 1312 (1970) (reversing convictions of anti-war protesters where the record left open the possibility that their arrests were content-based, but noting "petitioners' convictions could constitutionally have rested on *a finding that they sat or lay across a public sidewalk with the intent of fully blocking passage along it, or that they refused to obey police commands to stop obstructing the sidewalk in this manner and move on.*") (emphasis added).[4]

The same problems noted by the Court in *Cox* and *Bachellar* exist with respect to TCC Sections 16-35 and 25-51. Because the phrase "full, free and unobstructed public use" is unqualified by the intent of the actor, the personal predilections of individual officers is all that gives the law any standard. Who is to say when an individual is not *objectively* preventing the "full, free and unobstructed public use" of a sidewalk when the City's police cannot agree on a functional definition of the word obstruction? Such standardless enforcement places every citizen in the Downtown area at risk of arrest.[5]

---

[4] A statute may be so vague or so threatening to constitutionally-protected activity that it can be pronounced wholly unconstitutional; in other words, it is "unconstitutional on its face." *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Smith v. Goguen*, 415 U.S. 566 (1974). Generally, a vague statute that regulates in the area of First Amendment guarantees will be pronounced wholly void. *Winters v. New York*, 333 U.S. 507, 509–10 (1948); *Thornhill v. Alabama*, 310 U.S. 88 (1940).

[5] Indeed, an ordinance making it a criminal offense for three or more persons to assemble on a sidewalk and conduct themselves in a manner annoying to passers-by was found impermissibly

-10-

"A legislature must establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U. S. 566, 574 (1974). Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.*, at 575.[6] This result is patently unconstitutional; the City of Tucson may not empower its Police "to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969).[7]

---

vague and void on its face because it encroached on the freedom of assembly. *Coates v. City of Cincinnati*, 402 U.S. 611 (1971). Compare *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965) (conviction under statute imposing penalty for failure to "move on" voided); *Bouie v. City of Columbia*, 378 U.S. 347 (1964) (conviction on trespass charges arising out of a sit-in at a drugstore lunch counter voided since the trespass statute did not give fair notice that it was a crime to refuse to leave private premises after being requested to do so); *Kolender v. Lawson*, 461 U.S. 352 (1983) (requirement that person detained in valid Terry stop provide "credible and reliable" identification is facially void as encouraging arbitrary enforcement). Similar concerns regarding vagrancy laws had been expressed previously. See, e.g., *Winters v. New York*, 333 U.S. 507, 540 (1948) (Justice Frankfurter dissenting); *Edelman v. California*, 344 U.S. 357, 362 (1953) (Justice Black dissenting); *Hicks v. District of Columbia*, 383 U.S. 252 (1966) (Justice Douglas dissenting).

[6] This concern for minimal guidelines finds its roots as far back as the decision in *United States v. Reese*, 92 U. S. 214, 221 (1876):

> "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government."

[7] Although Plaintiffs' failed to mention so in the main text for want of space, Plaintiffs' note they have a constitutional right under the First Amendment to freedom of association which encompasses the right to associate for charitable purposes. This freedom to engage in group effort is guaranteed under the doctrine of expressive association, *Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290 (1981), which allows citizens to advance political, social, economic, educational, religious, and cultural ends as a group. See, e.g., *NAACP v. Claiborne Hardware Co.*, 458 U.S. 866 (1982); *Larson v. Valente*, 456 U.S. 228 (1982); *In re Primus*, 436 U.S. 412 (1978); *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977). The

-11-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

2.) The Fundamental Right to Travel.

Ordinances such as the ones in question here violate the fundamental right to travel protected by the Fourteenth Amendment to the U.S. Constitution. Very little shelter is truly "available" to indigents, and as a result anti-homeless ordinances burden homeless individuals' freedom of movement within the city in which they reside, forcing migration to other communities. See *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (Law prohibiting wandering the streets at night without ID implicated "consideration of the constitutional right to freedom of movement.").[8] At the same time, such ordinances inhibit indigents' ability to migrate because the passage of such laws in major cities results in a domino effect as surrounding communities pass similar laws. In inhibiting an indigent's right to remain in the community, while simultaneously making it more difficult for

---

ordinances under question here unduly burden this right as Plaintiffs are currently disallowed property items necessary to the proper function any charitable gathering.

[8] Most of the Court's right-to-travel jurisprudence has focused on "penalty analysis." Under this analysis, a law burdens the right to travel if it "penalizes" migration. The Court has been more willing to find that a "penalty" implicates the right to travel when the challenged law deprives a migrant of a "necessity of life." See, e.g., *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 259 (1973). The Court has defined "necessities of life" to include welfare for indigents and free nonemergency medical care. *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969) (holding that a one-year residency requirement for welfare benefits burdened travel because it denied benefits solely on the basis of the hopeful recipient's recent move into the jurisdiction); *Memorial Hosp.*, 415 U.S. at 259 (applying the rationale used in Shapiro to a law denying nonemergency medical care to recent migrants). The burdens caused by antihomeless laws implicate the same concerns as those caused by the denial of welfare and medical care. Basic human functions, although not government entitlements, are a necessity of life—arguably even more basic than welfare for the indigent or nonemergency medical care for the sick. Like the other recognized necessities, property items necessary for protection from the elements to facilitate sleep for the weary involves "the immediate and pressing need for preservation of life and health." *Memorial Hosp.*, 415 U.S. at 260, n.15 (quoting *Starns v. Malkerson*, 326 F. Supp. 234, 238 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) (emphasis omitted). Indeed, imposing a criminal sanction can be a much more severe penalty than withholding a governmental benefit.

-12-

indigents to migrate to other communities, anti-homeless laws burden the right to both interstate and intrastate travel.[9]

For example, one court has reasoned that the right to travel is violated by "any and all features of [a zoning] plan which, directly or indirectly, seek to control" migration. In *Construction Industry Association v. City of Petaluma*, 375 F. Supp. 574 (N.D. Cal. 1974), *rev'd on other grounds*, 522 F.2d 897 (9th Cir. 1975), *cert. denied*, 424 U.S. 934 (1976), a city adopted a zoning ordinance limiting new home construction. Because the ordinance had the "express purpose and the intended and actual effects of . . . exclud[ing] substantial numbers of people who would otherwise have elected to immigrate into the city," it burdened the right to travel. *Id.* at 581. The court explicitly stated that its holding covered qualitative as well as quantitative controls on migration: "[The] holding is intended to encompass, *not only the outright numerical limitations*[,]" but also all aspects of the zoning plan that "*seek to control*" in-migration. *Id.* at 586 (emphasis added). The court further explained why ordinances designed to be exclusionary burden the right to travel:

> The question posed is whether the township can stand in the way of the natural forces which send [our] . . . population . . . in search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic or otherwise, . . . cannot be held valid. . . . It is not for any given township to say who may or may not live within its confines. . .

---

[9] The barrier to in-migration created by antihomeless laws such as the one before the Court exceeds the one deemed impermissible in *Edwards v California*, 314 US 160, 62 S. Ct. 164, 86 L. Ed. 119 (1941). In that case, the law punished the person who brought the indigent migrant into the jurisdiction, whereas antihomeless laws threaten to punish the migrant himself. A law like that in *Edwards* will not deter the in-migration of those who can enter the jurisdiction without the help of others, whereas an antihomeless statute creates a barrier against the entry of all homeless people. The erection of this direct barrier constitutes a "burden" on the right to travel.

-13-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

*Id.* at 585-86 (quoting *National Land and Inv. Co. v. Easttown Township. Bd. of Adjustment*, 419 Pa. 504, 532, 215 A.2d 597, 612 (1965) & *Appeal of Kit-Mar Builders*, 439 Pa. 466, 474, 268 A.2d 765, 768-69 (1970)); see also *Edwards v. California*, 314 U.S. at 183 (Jackson, J., concurring) ("[t]hat choice of residence was subject to local approval is contrary to the inescapable implications of the westward movement of our civilization"); *Appeal of Girsh*, 437 Pa. 237, 263 A.2d 395 (1970) (zoning scheme's failure to provide for apartments excludes those who would be able to live in the township if apartments were available). Under this reasoning, any ordinance designed to exclude people from a jurisdiction is constitutionally suspect.[10]

States have attempted to justify laws prohibiting sleeping and camping in public[11] as both supporting aesthetically-pleasing urban areas and reducing crime; however, neither justification is "compelling" when examined under the strict scrutiny test imposed on any law burdening the right to travel. See *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1581 (S.D. Fla. 1992) (An "interest in having

---

[10] The Ninth Circuit in *Petaluma*, 522 F.2d 897 (1985), held that plaintiffs construction industry association and landowners did not have standing to assert a right to travel violation, *id.* at 904-05, and that the challenged ordinance did not violate the due process or commerce clauses. *Id.* at 908-09. Because the court dismissed the right to travel claim for lack of standing, it did not rule on the merits of the issue. *Id.* at 906 n.13. However, in dicta the court did note that the law did "not have the undesirable effect of walling out any particular income class." *Id.* at 908; see also *id.* at 906 n.13 ("[W]e note that the Petaluma Plan is not aimed at transients."). Thus, if faced with a right to travel claim from a plaintiff with standing, the court may well react differently to an ordinance which attempts to evict the homeless population from a jurisdiction.

[11] We do not address the constitutionality of less comprehensive antisleeping laws. However, it is worthwhile to note that an antisleeping ordinance that prohibits sleeping only in certain areas does not have the effect of banning the in-migration of homeless people. Many jurisdictions have more limited ordinances which prohibit sleeping in a particular place. See, e.g., 36 C.F.R. § 7.96(i) (1988) (prohibiting "sleeping activities, or making preparations to sleep . . . or storing personal belongings" in parks or the National Capital District, except in designated campgrounds). Section 7.96(i) succeeds 36 C.F.R. § 50.27(a), repealed in 1986. FED. REG. 37,011, 37,019 (1986). The Court has upheld one such regulation. Section 50.27(a) withstood a constitutional challenge in *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984) (federal agency permitted to prohibit sleeping in national parklands).

-14-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

aesthetically pleasing parks and streets" is "not compelling" where there is a "necessity of homeless persons to be in some public place."); *Loper v. New York City Police Dep't*, 802 F. Supp. 1029, 1046 (S.D.N.Y. 1992) ("A peaceful beggar poses no threat to society. The beggar has arguably only committed the offense of being needy.").

3.) Equal Protection.

The heavy-handed enforcement of the ordinances before the Court is based on animus against homeless individuals and the Court should therefore apply a heightened level of scrutiny to the laws and their application. A close reading of the Supreme Court opinions of *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) and *United States v. Windsor*, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013) leads to this conclusion. In these cases the Court did not apply the familiar equal protection framework, which inquires as to the applicable level of scrutiny and then analyzes the law's justifications. Instead, the Court based its conclusion on the law's blatant improper purpose and animus.

In *Romer*, the Supreme Court considered an amendment to the Colorado Constitution that prohibited any department, agency, or municipality of the State of Colorado from adopting any law or regulation that would protect gay men, lesbians, or bisexuals from discrimination. 517 U.S. at 624, 116 S.Ct. 1620. The amendment not only prevented future attempts to establish these protections, but also repealed ordinances already adopted by the cities of Denver, Boulder, and Aspen. *Id.* at 623-24, 116 S.Ct. 1620. The Supreme Court held that the amendment was unconstitutional because it violated the Equal Protection Clause. *Id.* at 635, 116 S.Ct. 1620. While the Court cited the rational basis test, the Court also stated that the Colorado law "confound[ed] this normal process of judicial review." *Id.* at 633, 116 S.Ct. 1620. The Court held that the law had no rational

-15-

relation to a legitimate end because: First, the Court ruled that it was not "within our constitutional tradition" to enact a law "declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government[.]" *Id.* Second, the Court held that "laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634, 116 S.Ct. 1620. The Court's analysis focused more on the purpose and effect of the Colorado amendment than on a consideration of the purported legitimate interests the State asserted in support of its law.

The Supreme Court's opinion in *Windsor* is similar. The Court did not analyze the legitimate interests cited by DOMA's defenders as typical in a rational basis review. See *Windsor*, 133 S.Ct. at 2707 (Scalia, J., dissenting) ("[The majority] makes only a passing mention of the `arguments put forward' by the Act's defenders, and does not even trouble to paraphrase or describe them."). Instead, the Court focused on the "design, purpose, and effect of DOMA," *id.* at 2689, and held that the law's "avowed purpose and practical effect" was "to impose a disadvantage, a separate status, and so a stigma" on same-sex couples that a state had permitted to wed. *Id.* at 2693. Because DOMA's "principal purpose" was "to impose inequality," *id.* at 2694, the Court ruled that the law deprived legally wed same-sex couples of "an essential part of the liberty protected by the Fifth Amendment." *Id.* at 2692.

In both *Romer* and *Windsor*, the Court cited the following statement from *Louisville Gas & Elec. Co. v. Coleman*: "Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." 277 U.S. 32, 37-38, 48 S.Ct. 423, 72 L.Ed. 770 (1928), *quoted in Romer*, 517 U.S. at 633, 116 S.Ct. 1620. Indeed, the *Windsor*

-16-

Court held that "discriminations of an unusual character *especially require careful consideration*." 133 S.Ct. at 2693 (emphasis added) (citation omitted).

The Court's emphasis on discriminations of an unusual character demonstrates that when presented with an equal protection challenge, courts should first analyze the law's design, purpose, and effect to determine whether the law is subject to "careful consideration." If the principal purpose or effect of a law is to impose inequality, a court need not even consider whether the class of citizens that the law effects requires heightened scrutiny or a rational basis approach. Such laws are "not within our constitutional tradition," *Romer*, 517 U.S. at 633, 116 S.Ct. 1620, and violate the Equal Protection Clause regardless of the class of citizens that bears the disabilities imposed by the law. If the law merely distributes benefits unevenly, then the law is subject to heightened scrutiny only if the disadvantages imposed by that law are borne by a class of people that has a history of oppression and political powerlessness.

Moreover, an impermissible motive does not always reflect "malicious ill will." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). It can also take the form of "negative attitudes," "fear," "irrational prejudice," or "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *City of Cleburne, Tex.*, 473 U.S. at 448, 450; *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring).

Ordinances that proscribe performing basic human functions in public seem to be aimed at homeless "transients" and not at the acts themselves:[12] It is

---

[12] Emphasizing the constitutional importance of a law's objective, the Supreme Court has found a zoning ordinance constitutional because it was not aimed at transients. In *Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974), a town adopted a zoning ordinance that limited to two the number of unrelated persons who could live in any one household. *Id.* at 2. Applying a rational basis test, the Supreme Court rejected the plaintiff's right-to-travel challenge and upheld the law because it was a reasonable zoning regulation not aimed at transients. *Id.* at 7-8. Accordingly,

-17-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

extremely unlikely that a community would choose to prohibit sitting or sleeping with property items in public because of any evil associated with the conduct itself. Moreover, expressions of group antagonism have traditionally provided strong evidence of legislative purpose, see, e.g., Note: *Impermissible Purposes and the Equal Protection Clause*, 86 COLUM. L. REV. 1184, 1207 (1986); and, not surprisingly, a review of attitudes in Tucson indicates that concerns regarding the homeless are the primary motivating force behind the new enforcement regime. See *Cooper's Declaration* at p. 3; ¶7 ("Because of the protest activity at Veinte De Agosto Park, wealthy business owners have put pressure on the City government to 'clean up the homeless problem.'"); *see also More Business Leaders Demand Action at Homeless Park*, KVOA Report Jun 11, 2015 (http://www.kvoa.com/story/29302931/more-business-leaders-demand-action-at-homeless-park) (website last visited 6/29/2015) ("Buzz Isaacson is the broker for One South Church, Southern Arizona's tallest high-rise. He called a meeting of business leaders and city officials Thursday afternoon. John Jacobs is the chairman of the Downtown Merchants Association. 'Though we have been patient, we would like to see some action,' he said. 'And we're almost to the point that we're going to insist.' People at the meeting also asked the city to close the metered spaces on the street near the park. *They hope that will discourage the groups that regularly feed the population*.") (emphasis added).[13]

---

the Court's holding lends great weight to Plaintiffs' argument that law enforcement aimed specifically at transients is inherently irrational and cannot be constitutionally maintained.

[13] One day later the City promulgated the enforcement policy at issue here. *See City Takes Action Against Downtown Homeless Camp*, KVOA Report Jun 12, 2015 http: //www. kvoa. Com /story /29310307 /city- takes- action- against- downtown- homeless-camp, webpage last visited 6/25/2015 (Noting that "The city is closing Veinte De Agosto Park and the police are ordering the removal of abandoned property on the sidewalk. A group of Downtown business owners held a meeting with city leaders. They requested the city close the park, bag the parking meters and pass an ordinance banning urban camping. Council Member Steve Kozachik

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

In addition, even without documentary evidence of such motivation, the Court can infer evidence of purpose from the overwhelmingly disproportionate effect such laws have on the homeless.[14] Because few people who have access to

participated in that meeting. "). See also, *Changes at Homeless Park not Immediately Enforced at Deadline*, KVOA Report Jun 14, 2015 http:// www.kvoa.Com/story/ 29318074/ changes- at- homeless- park- not-immediately- enforced- at- deadline, webpage last visited 6/25/2015 ("Kent Simpson is a real estate agent with an office Downtown. He is one of many business people who have been hoping the city would do something about the park 'Some customers aren't bothered by it, while others have decided to buy in other areas,' Simpson said. 'Because they don't really want to have to deal with an ongoing issue that doesn't seem to be getting solved.'"); *Downtown Businesses Speak About "Dream Pods" for the First Time*, KVOA Report Feb 27, 2015 ("[Tourists] are having interactions with the people in the boxes and that dogs are coming out and there is a smell issue," said Dan Gibson, director of corporate communications for Visit Tucson. "We are seeing people who are saying they might not be inclined to come back." The Downtown Merchants Association sent a request to the city for immediate action stating in part:

> "Merchants have been experiencing an increase in crimes and incidents in and around our businesses and have come together to address this situation . . .The inhumane living conditions, waste and excrement; incidents of assault, violence, aggression, animal attacks, illegal drug possession, use and distribution of narcotics in the area have created a dangerous and unacceptable environment for everyone including the protestors, our community and guests. . .As a business community we are compassionate and actively engage with social service agencies and the downtown homeless population."

The association has even asked the city for a few solutions. "Put 24 hour, 7 days a week police officers with body cameras at the park to ensure nobody's constitutional rights are violated," said John Jacobs, head of the Downtown Merchants Association.)

[14] See *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (Stating that "[t]he impact of the [law] may provide an important starting point in determining the existence of a discriminatory purpose.). The California Supreme Court has recognized the importance of looking beyond facially neutral language in order to acknowledge a law's true, though unstated, purpose:

> [W]e cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men; and where an ordinance, though general in its terms, only operates upon a special race, sect or class, it being universally understood that it is to be enforced only against that race, sect or class, we may justly conclude that it was the intention of the body adopting it that it should only have such operation, and treat it accordingly.

-19-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

safe, sanitary shelter regularly sit or sleep with property items in outdoor public areas, the vast majority of those arrested are homeless. The purpose of deterring the in-migration of indigents cannot serve as justification for the new enforcement regime. If a law has "no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." *United States v. Jackson*, 390 U. S. 570, 390 U. S. 581 (1968).

Such ordinances disproportionately affect the homeless in yet another way: by proscribing conduct vital to their survival, they effectively evict the homeless. Unlike a zoning ordinance that causes a person to choose not to migrate to a city merely because she prefers a different lifestyle, an antihomeless ordinance leaves a homeless individual with no choice. Because she must perform basic human functions in public or not at all, a statute prohibiting such conduct effectively prevents her from living in the jurisdiction. Antihomeless laws' purposefully exclusionary effect and their extreme disproportionate impact on the homeless clearly distinguish them from traditional zoning laws that have only incidental effects on migration. Indeed, as stated above, the practical effect of these laws is to force Plaintiffs into the Hobson's choice of keeping personal possessions or using critical services.

Regardless of the justifications provided by an enactment's proponents, the Supreme Court has clearly stated that if such an enactment violates the U.S. Constitution—whether passed by the people or their representatives—judicial intervention is necessary to preserve the rule of law. See, e.g., *Watson v. City of Memphis*, 373 U.S. 526, 528 (1963) (rejecting appeal by city to permit delay in

---

*Parr v. Municipal Court*, 3 Cal.3d 861, 866, 479 P.2d 353, 356, 92 Cal. Rptr. 153, 156 (1971) (quoting *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879) (No. 6,546)), *cert. denied*, 404 U.S. 869(1971).

-20-

desegregation based on alleged "need and wisdom of proceeding slowly and gradually"). The electorate cannot order a violation of the Due Process or Equal Protection Clauses by referendum or otherwise, just as the state may not avoid their application by deferring to the wishes or objections of its citizens. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

### B. *Irreparable Injury.*

The Ninth Circuit has held that "an alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir.1991); see also *Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753 (N.D.Cal.1989) ("In various cases, courts in the Ninth Circuit have presumed irreparable harm from an alleged violation of constitutional rights."). Plaintiffs have shown a likelihood of proving past constitutional violations and that there is a potential for continuing violations, especially considering that the City has been ordered to stop similar practices in the past. See, e.g., *Cooper v. City of Tucson*, CV 12-208 TUC DCB (D. Ariz. 2015) (Doc. #90, pp. 15, 16, 17-18).[15]

---

[15] "*Lavan* was NOT about a constitutionally-protected property right to leave possessions abandoned on public sidewalks. *Id.* at 1027. The case was about whether homeless persons instantly and permanently lose protected property interests in their possessions by leaving them momentarily unattended in violation of a municipal ordinance. *Id.* The court held they do not, and the City cannot treat "unattended" personal property of homeless persons differently than it treats an unattended car parked in a "no parking" zone. *Id.* at 1032. Under *Lavan*, the City must distinguish between personal property that is abandoned or simply left unattended or in the attendance of another person. Only property that in good-faith appears to be abandoned is subject to seizure. The Court finds the Plaintiffs have shown a likelihood of prevailing on the claim that police are harassing protestors by seizing personal property that is not abandoned...

**IT IS FURTHER ORDERED** that Defendant the City of Tucson is enjoined as follows:

(1) Applying the 3-B Policy to define obstruction; obstruction shall be defined in accordance with TCC § 11-36.2 which allows the free exercise of First Amendment rights, including free exercise of religion, speech and assembly; provided, however, that the person sitting or lying on the public sidewalk remains at least eight (8) feet from any doorway or business entrance, leaves

-21-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

## C. *Balancing of Equities and the Public Interest.*

A court considering an application for a preliminary injunction must identify the harm that an injunction might cause a defendant and weigh it against the injury to a plaintiff. *Justin v. City of Los Angeles*, 2000 WL 1808426, at *11 (citing *Armstrong v. Mazurek*, 94 F.3d 566, 568 (9th Cir.1996)).

The only hardship the City could claim here is that an injunction would hamper its efforts to ensure the health, safety and the economic vitality of the City of Tucson. The Supreme Court recognizes that local governments have a substantial interest in the preservation of aesthetic values. See *Village of Belle Terre v. Boraas*, 416 U.S. 1, 6 (1974) (recognizing the community's right to protect aesthetic concerns in zoning cases); *Berman v. Parker*, 348 U.S. 26, 33 (1954) ("It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."). Here, Defendants may be slowed in their efforts to keep the City, and especially the downtown area, clean and safe. An injunction may disturb the City's ongoing initiative to revitalize and uplift communities, to improve the streets and sidewalks, and to diminish the crime rate.

However, the City's interest in clean streets is outweighed by Plaintiffs' interest in maintaining the few necessary personal belongings they might have. The risk of harm is greater if the injunction is not granted: the violation of Plaintiffs' Fourth, Eighth and Fourteenth Amendment rights. The Court in *Pottinger* eloquently expressed the dangers homeless individuals face in analogous situations:

---

open a five (5) foot path and does not otherwise block or impede pedestrian traffic.

(4) Seizing any personal property that in good-faith does not appear to be abandoned."

-22-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

> The court recognizes the City's interest in keeping its parks and public areas clear of unsightly and unsafe items. However, the City's interest in having clean parks is outweighed by the more immediate interest of the plaintiffs in not having their personal belongings destroyed. As this court previously found, the loss of such items such as clothes and medicine threatens the already precarious existence of homeless individuals by posing health and safety hazards.

*Pottinger*, 810 F. Supp. at 1573. Similarly, Defendants' actions are likely to displace homeless individuals and threaten their ability to access charities and governmental programs for food, shelter, and assistance in the City of Tucson. As the *Pottinger* Court stated, Defendants' actions are likely to "threaten[ ] the already precarious existence of homeless individuals by posing health and safety hazards." *Id.*

Indeed, it is irrational to conclude antihomeless legislation protects commerce because homelessness is not the cause of economic downturns. See Maria Foscarinis, *Downward Spiral: Homelessness and Its Criminalization*, 14 Yale L. & Pol'y Rev. 1, 56 (1996) (stating economic decline is not caused by homelessness). Rather, homelessness is more likely a result of a locality's economic decline as economic downturns are caused by various global and national economic factors. *Id.* The arresting of homeless individuals is unlikely to solve the economic problems which plague business districts. Without housing alternatives, anti-homeless legislation forces homeless people to move from one area to another, while ignoring the underlying economic issues. Using the criminal justice system to address economic recessions, rather than providing housing and services to those in need, fails to create any long-term benefits or lasting solutions for the problem of homelessness.

City ordinances and policies that broadly attack homeless people rather than narrowly address the social and economic issues at the root of homelessness are ineffective. Criminalizing homelessness fails to address the fact that penalizing

-23-

people for engaging in activities such as sleeping or storing property in public, sitting on public sidewalks, or asking for handouts will not deter these activities or keep public places clear of homeless people. People who are homeless have no alternative places to sleep or sit, and no other means of subsistence. Punishing people for actions and behavior they cannot reasonably avoid not only offends the Constitution, but is irrational and inhumane.

Finally, the City will still be able to lawfully seize and detain property, as well as remove hazardous debris and other trash; issuance of the injunction would merely prevent it from unlawfully seizing and destroying personal property that is not abandoned without providing any meaningful notice and opportunity to be heard. See *Cooper v. City of Tucson*, CV 12-208 TUC DCB (D. Ariz. 2015) (Doc. #90, p. 18) (noting that "this preliminary injunction does not apply to preclude the City from acting to protect the public health or safety nor adopt reasonable time, place, and manner restrictions under the First Amendment."). Moreover, it will prevent the City from applying vague laws in violation of the Federal Constitution. This not only benefits the Plaintiffs, but the general public as well. See *Pottinger*, 810 F. Supp. at 1573.

### 4. Conclusion

Homelessness is one of the most pervasive social problems in the United States. As the number of homeless individuals and families continues to increase, so do the myriad of obstacles and barriers the homeless face on a daily basis: the cold, the heat, the hunger, the disease and lack of medical treatment; the danger, the beatings, the loneliness; and the shame and despair that may come from being unable to care for oneself, one's child, or a friend. Not only must the homeless secure the basic necessities of food and shelter, they must also defend themselves against harassment, discrimination, and inequality.

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

Antihomeless laws burden the fundamental right to travel. Their purpose and effect are to erect a barrier which bans the migration of homeless people into the jurisdiction, and to drive out those homeless individuals who already live in the community. See, e.g., *Cooper's Declaration* at p. 5; ¶11 (noting that "[t]he threat of arrest is real and constantly hangs over the heads of the entire homeless community. *Many have left the City to avoid the harsh enforcement.*") (emphasis added). These ordinances further burden the right to travel because they penalize the migration of the homeless into the jurisdiction by denying them a basic necessity of life. See *Cooper's Declaration* at p. 4; ¶10 ("The property items I keep are fundamental necessities of life which have been utilized by human societies over the last 100 years—toothbrushes, clothing, soap, blankets, tarps, government documentation, books, personal diary, laptop computer, mementos from family and friends"); *id.* at p. 5; ¶11 ("Accordingly, I am effectively barred from sleeping in public anywhere in the City legally unless I chose to discard all or most of my property items."). Not only does this violate the City of Tucson's obligations under the Federal Constitution, these actions have created and continue to create hardship and inequity by forcing the homeless out of the city center—the very place where services for these people are located.

By turning to the criminal justice system to deal with the problem of homelessness, Defendants ignore the source of the problem, thus allowing it to worsen. Ultimately, the solution to this problem must come from the Congress and the State legislatures in the form of greater support services for the deinstitutionalized mentally ill and a commitment to resolve the low-income housing crisis. The solution certainly will not come from funneling the homeless through the criminal justice system without regard for their constitutional rights.

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

Accordingly, for the foregoing reasons, and based on the foregoing authorities, the Court should enjoin the City of Tucson from applying or enforcing Tucson City Code §§ 16-35 or 25-51 against Plaintiffs or others similarly situated.

**RESPECTFULLY SUBMITTED** this 29th day of June, 2015.

_____               _____
       John Cooper, Jr.                                          Jonathan McLane
       *Pro Se* Plaintiff                                           *Pro Se* Plaintiff

Copies of the forgoing delivered
This date to:

Carl Sammartino
Sammartino Law Group, P.L.L.C.
5240 E. Pima Street, #113
Tucson, AZ 85712
**Attorney for Plaintiffs in *Cooper v. City of Tucson***

Christopher E. Avery
Principal Assistant City Attorney for Michael G. Rankin
**Tucson City Attorney**

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

Accordingly, for the foregoing reasons, and based on the foregoing authorities, the Court should enjoin the City of Tucson from applying or enforcing Tucson City Code §§ 16-35 or 25-51 against Plaintiffs or others similarly situated.

**RESPECTFULLY SUBMITTED** this 29th day of June, 2015.

_____                    _____
John Cooper, Jr.                                                        Jonathan McLane
*Pro Se* Plaintiff                                                       *Pro Se* Plaintiff

Copies of the forgoing delivered
This date to:

Carl Sammartino
Sammartino Law Group, P.L.L.C.
5240 E. Pima Street, #113
Tucson, AZ 85712
**Attorney for Plaintiffs in** *Cooper v. City of Tucson*

Christopher E. Avery
Principal Assistant City Attorney for Michael G. Rankin
**Tucson City Attorney**

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716