**Occupy Public Land**
**3054 N. Edith Bvld.**
**Tucson, Ariz. 85716**
John Thomas Cooper, Jr.
Executive Organizer
Secretarial Working Group
E-Mail: southwestrecords@gmail.com Phone:
(520) 818-8734

Jon McLane
Chief Executive Organizer
Field Outreach Working Group
E-Mail: jonathanmclane@yahoo.com Phone:
(520) 329-9192



FILED _____ LODGED
_____ RECEIVED _____ COPY

8 | JUN 2 9 2015 | 8

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

JON MCLANE, et. al.,

          Plaintiffs,

    vs.

CITY OF TUCSON, et. al.,

        Defendants.

Case No.: 4:15-CV-13-JAS

**DECLARATION IN SUPPORT
OF MOTION FOR TEMPORARY
RESTRAINING ORDER**

Plaintiff John Thomas Cooper, Jr., now comes before the Court and states the following in support of his request for Temporary Restraining Order:

I, John Thomas Cooper, Jr., of sound mind and based upon personal knowledge and information known to me, do declare and depose as follows:

1). I am a citizen of the United States and of the State of Arizona, currently residing in the City of Tucson, in the County of Pima.

2). I am currently homeless, with a physical address of 99 South Church Ave., Tucson, Ariz. 85701. My mailing address is 3054 N. Edith Blvd., Tucson, Ariz. 85716.

3). As a homeless individual I require certain necessary property items most of which I keep either on my person or in my immediate reach. This includes such items as two or three changes of clothes, hygiene items, any medications I might require or that are prescribed by a doctor, imperishable food items, water, and items to protect me from the elements when I sleep or if it rains.

4). Places which provide critical services—such as those provided by the County Library, the Courts, City Hall, County Administration, Adult Probation, Adult Parole, DES, Social Security, Arizona Dept. of Revenue, United States Dept. of Internal Revenue, Arizona Dept. of Transportation Motor Vehicle Division, local colleges, local hospitals, etc.—bar individuals from bringing 'large' amounts of property into their establishments.

5). As an example of such policies, I have attached as Exhibit 1 a true and correct copy of the Pima County Public Library *Customer Code of Conduct*, which states:

**CUSTOMER CONDUCT:**

**1. Safe Environment.** The following actions or behaviors are not allowed on Library property:

1.7. Bringing into the library, or attempting to place or store in the library, any item(s) that:

1.7.7. Has a total dimension in excess of 55-inches (excluding items necessary for medical purposes or child care).

1.8. Leaving packages, backpacks, luggage, or any other personal items unattended. Unattended items are subject to removal without notice.

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

See also http://www.library.pima.gov/policies-guidelines/ (webpage last visited 6/27/15).

6). It is normal practice among the homeless population in Tucson for individuals who require the services of one of the aforementioned service providers for the individual to leave his or her property in the custody of another individual for safekeeping until they can return to retrieve the property.

7). Because of the protest activity at Veinte De Agosto Park, wealthy business owners have put pressure on the City government to "clean up the homeless problem." The police have used their knowledge of the customs of the homeless concerning the safekeeping of their property as a means to attack the population for remaining in the area, and to force them out of the jurisdiction.

8). On June 14th, 2015, the Tucson Police promulgated a new policy of enforcement against homeless citizens to arrest and confiscate their property if they reside on the City sidewalks. This policy applies City-wide. The Police issued a memorandum which stated two City Code Sections as applicable to the conduct of the homeless population with respect to City sidewalks. I have attached as Exhibit 2 a true and correct copy of the memorandum, which states:

> **Obstructing sidewalks by placing items that prevent the public's full and free use violates [TCC] Sections 16-35 and 25-51. Beginning at 10:00 P.M., on Sunday, June 14th, persons who place, allow, or maintain property in violation of the above ordinances after the above stated time are subject to citation and prosecution.**

> Sec. 16-35 provides: "No person shall obstruct any public sidewalk, street or alley in the city by placing, maintaining or allowing to remain thereon any item or thing that prevents full, free and

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

unobstructed public use in any manner, except as otherwise specifically permitted by law."

Sec. 25-51 provides: "No person shall obstruct any public sidewalk in the city, by placing, depositing or allowing to remain thereon, any boxes, crates, goods, wares, merchandise, hay, grain, farm produce or other thing, or prevent, in any manner, the full, free and unobstructed public use of any of the public sidewalks, . . . "

**Unattended property left in violation after 10:00 P.M., on Sunday, June 14th, 2015 shall be considered abandoned and subject to immediate removal by the City of Tucson.**

9). I have questioned 13 Tucson Police Officers concerning the meaning of these ordinances and how they will be enforced by the government. These officers gave conflicting statements. According to these officers, the ordinances mean either—(1) Individuals are not allowed to have any property what-so-ever on the Downtown sidewalks; (2) Individuals are allowed a bed roll, backpack, and a beverage; or (3) Individuals are allowed only the amount of property which they can carry in one trip.

10). The property items I keep are fundamental necessities of life which have been utilized by human societies over the last 100 years—toothbrushes, clothing, soap, blankets, tarps, government documentation, books, personal diary, laptop computer, mementos from family and friends—the every things which make us uniquely human are the things which are stripped away from me by the enforcement of this rule of law.

11). This law makes all people who are homeless like me instant criminals. I do not have the money or resources to leave the City, and I must keep my property in public. I have no private places available for me to store my property

-4-

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

items. I am directly at risk of arrest 24 hours a day in the entire City of Tucson for the "crime" of being homeless with property. Whether awake or asleep, I must keep my property with me or someone I trust to keep it safe. Accordingly, I am effectively barred from sleeping in public anywhere in the City legally unless I chose to discard all or most of my property items. The threat of arrest is real and constantly hangs over the heads of the entire homeless community. Many have left the City to avoid the harsh enforcement.

12). In addition, since the new enforcement has commenced, the police have aggressively prevented others from watching another's property when using critical services, such as the restrooms within establishments which bar bringing property in, forcing me and others to relieve ourselves outside in violation of the law and risk arrest.

13). On June 19, 2015, I wrote a letter to the City detailing the constitutional issues with the current enforcement practices of the Tucson Police. I have attached as Exhibit 3 a true and correct copy of the letter which was delivered to the City Attorney, Chief of Police, and the Mayor, among others via email. The City has failed to respond or to take action to protect my constitutional rights.

14). Without immediate action from the Court, 100s of homeless people—myself included—face certain confiscation of their personal possession as soon as they succumb to the need to use services provided by establishments which require them to leave their property outside. We are forced to live in fear and uncertainty as being arrested for sleeping with, sitting with or storing property in public is a constant threat.

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the forgoing is true and correct.

**RESPECTFULLY SUBMITTED** this 29th day of June, 2015.

_____
John Cooper, Jr.
*Pro Se* Plaintiff

Copies of the forgoing delivered
This date to:

Carl Sammartino
Sammartino Law Group, P.L.L.C.
5240 E. Pima Street, #113
Tucson, AZ 85712
Attorney for Plaintiffs in *Cooper v. City of Tucson*

Christopher E. Avery
Principal Assistant City Attorney for Michael G. Rankin
Tucson City Attorney

Occupy Public Land
3054 N. Edith Blvd.
Tucson, Ariz. 85716

# EXHIBIT 1

**Pima County Public Library**
*Customer Code of Conduct*



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject: Pima County Public Library – Customer Code of Conduct Policy | Policy Number | Page |
|---|---|---|
| | D 32.6 | 1 of 6 |

## PURPOSE:

This policy is intended to:

- Protect the rights and safety of Pima County Public Library customers, volunteers and staff;
- Protect the library's materials, equipment, facilities and grounds;
- Guarantee that the Pima County Public Library is able to carry out its mission; and
- Ensure that access to Library facilities, programs, or services is not negatively impacted by behaviors that create an environment that is unsafe, disruptive, or not conducive to the Library's mission.

## POLICY:

Pima County Public Library ("PCPL") facilities are open to people of all ages and backgrounds. Customers are encouraged to use the library to:

- Read newspapers, magazines, books and other materials
- Check out library materials
- Attend meetings and programs
- Use computers
- Conduct research
- Complete homework
- Seek information

## CUSTOMER CONDUCT:

1. **Safe Environment.** The following actions or behaviors are not allowed on Library property:

    1.1. Any act that constitutes a criminal offense under federal, state, or local law, including, but not limited to:

    1.1.1. Engaging in prohibited activities that relate to material involving the sexual exploitation of minors;

    1.1.2. Using the Internet for activity that violates Arizona law, including engaging in activities that are harmful to minors when children are present;

    1.1.3. Theft;



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject: **Pima County Public Library – Customer Code of Conduct Policy** | Policy Number | Page |
|---|---|---|
| | D 32.6 | 2 of 6 |

    1.1.4. Vandalizing library property or causing damage to any other person's property;

    1.1.5. Indecent exposure, public sexual indecency, lewd acts, or any other sexual offense;

    1.1.6. Gambling, other than the types exempted by Arizona law;

    1.1.7. Disorderly conduct, including, but not limited to: fighting; engaging in violent or seriously disruptive behavior; or threatening or intimidating library staff or any library customer;

    1.1.8. Harassing or stalking library staff or any library customer. This conduct includes, but is not limited to:

        1.1.8.1. Filming or photographing any person without asking that person's permission;

        1.1.8.2. Continuing to film or photograph any person after being asked to desist;

        1.1.8.3. Engaging in conduct (such as persistent staring or gestures) that would cause a reasonable person to fear for his or her personal safety or feel distressed, alarmed, or harassed; or

        1.1.8.4. Using profane, offensive or abusive language that would cause a reasonable person to fear for his or her personal safety or feel distressed, alarmed, or harassed.

    1.1.9. Possessing, using, selling, or transferring any illegal drug; or

    1.1.10. Trespassing, including knowingly entering Library premises when access and use of library facilities has been suspended.

1.2. Bringing guns, weapons, knives (other than pocket knives), or other items designed or intended to injure or harm people, unless explicitly permitted by law.

1.3. Smoking, rolling, or using any tobacco product, marijuana, synthetic tobacco, synthetic marijuana or electronic or other e-cigarettes (smokeless or the equivalent).

1.4. Drinking alcoholic beverages or using powdered alcohol products.



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject:<br>**Pima County Public Library – Customer<br>Code of Conduct Policy** | Policy Number | Page |
| --- | --- | --- |
| | D 32.6 | 3 of 6 |

1.5. Entering a library building with animals, except for *bona fide* service animals as defined by federal and state law.

1.6. Creating tripping hazards, or blocking aisles, exits or entrances.

1.7. Bringing into the library, or attempting to place or store in the library, any item(s) that:

    1.7.1. Interferes with library operations;

    1.7.2. Creates a safety hazard;

    1.7.3. Denies space to other customers;

    1.7.4. Blocks aisles;

    1.7.5. Blocks access to or exit from the building;

    1.7.6. Is unsanitary or foul-smelling; or

    1.7.7. Has a total dimension in excess of 55-inches (excluding items necessary for medical purposes or child care).

1.8. Leaving packages, backpacks, luggage, or any other personal items unattended. Unattended items are subject to removal without notice.

2. **Personal Behavior.** The following actions or behaviors are not allowed on Library property:

2.1. Behaving in a manner that disrupts library operations, including, but not limited to:

    2.1.1. Being under the influence of alcohol, any drug or other intoxicant;

    2.1.2. Loud talking or yelling; or

    2.1.3. Running or physical horseplay.

2.2. Allowing a service animal to be disruptive, including, but not limited to, barking or other loud noises, not being under the control of the owner, exhibiting threatening postures and approaching other patrons uninvited.



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject: | Policy Number | Page |
|---|---|---|
| **Pima County Public Library – Customer Code of Conduct Policy** | D 32.6 | 4 of 6 |

2.3. Strong, pervasive odors, including body odor, clothing odor, and odors caused by food, perfume or cologne that are injurious to health, indecent, offensive to the senses or an obstruction to the free use or comfortable enjoyment of library premises by other library patrons or library staff.

2.4. Inappropriate use of water fountains or restrooms, including, but not limited to, soliciting or engaging in sexual conduct, bathing, or washing clothes.

2.5. Using the library as a place to sleep.

2.6. Soliciting handouts, donations or contributions.

2.7. Conducting sales activities.

2.8. Not wearing shoes or shirts, except for infants or toddlers.


3. **Use and preservation of library materials and property.** The following actions or behaviors are not allowed on Library property:

3.1. Failing to comply with: a library staff member's request to stop an inappropriate behavior; this Code of Conduct; or, any other library policy.

3.2. Manipulating or bypassing Library systems and procedures, such as those that regulate computer use.

3.3. Unplugging library equipment to utilize an electrical outlet.

3.4. Consuming food or beverages in a manner that:

    3.4.1. Creates an unclean environment;

    3.4.2. Disrupts the activities of staff or other customers;

    3.4.3. Disrupts the enjoyment of the library by other customers; or

    3.4.4. Soils, damages or in any way harms Library materials, equipment and property.

3.5. Consuming food at computer workstations.



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject:<br>**Pima County Public Library – Customer<br>Code of Conduct Policy** | Policy Number | Page |
|---|---|---|
| | D 32.6 | 5 of 6 |

3.6.    Failure to clean up any residue, wrappings, or spills after the consumption of food or beverages.

3.7.    Using furniture for anything other than its intended purpose (*e.g.* a table is not a foot stool).

3.8.    Engaging in activities not reasonably associated with use of a public library.

4.    **<u>Children in the Library</u>.**

4.1.    Children are expected to conduct themselves in a manner that does not violate the code of conduct or disrupt other customers. Library staff members are not caregivers or baby sitters. The library is not responsible for any consequences of a parent's or guardian's failing in his or her responsibilities.

4.2.    Additionally, the following actions or behaviors are not allowed on library property:

    4.2.1.  Disciplining a child in a manner that injures the child or disrupts other customers.

    4.2.2.  Leaving young children unsupervised or ignoring their disruptive behaviors.

    4.2.3.  Adult loitering in the children's areas for no legitimate purpose.

## ENFORCEMENT:

The rules set forth above are not intended to limit PCPL from taking action to ensure safety, security, and excellent customer service. Any behavior that is disruptive or that inhibits or prevents PCPL from providing a safe environment or accomplishing its mission may result in the denial of access to facilities and/or services.

These rules will be enforced evenly, consistently, and fairly. Library staff and security personnel will intervene to stop prohibited activities and behaviors. Law enforcement will be contacted if any customer engages in what is believed to be unlawful or dangerous behavior.

## CONSEQUENCES OF NON-COMPLIANCE:

Failure to comply with this and Library's other established policies may result in:

1.    The immediate removal of the customer from the premises; and/or



# PIMA COUNTY, ARIZONA
## BOARD OF SUPERVISORS POLICY

| Subject:<br><br>**Pima County Public Library – Customer<br>Code of Conduct Policy** | Policy Number | Page |
|---|---|---|
| | D 32.6 | 6 of 6 |

2.      Suspending the customer's access to Library facilities for a set period of time; and/or

3.      Denying access to specific services and/or programs.

**SUSPENSION OF LIBRARY PRIVILEGES:**

The librarian may immediately suspend a customer's Library privileges or access to activities, services or facilities if the situation is a serious offense and constitutes a violation of PCPL policies. Examples of serious offenses include, but are not limited to: verbal abuse; violence; threatening behaviors; sexual harassment; vandalism; drug sale, attempted sale or use; intoxication; theft or attempted theft; physical harassment; sexual misconduct; or any behaviors that threaten the safety and security of customers or staff. The librarian may also issue suspensions for repeated violations of library policies.

A suspension may be appealed in writing to the Library Director within 10 calendar days of the date the suspension is issued. The appeal must clearly state why the customer believes that the privileges should be restored. The appeal should be sent to:

Pima County Public Library
Administrative Offices
101 N. Stone Ave.
Tucson, AZ 85701

The Director, or a designee, will review and respond to the appeal in writing within 10 business days of the date the appeal was received. The suspension remains in effect until the Director has reviewed the appeal and issued a decision.

The decision of the Director is final.

Adoption Date:    August 7, 2007
Revised Date:     May 5, 2015
Effective Date:    May 5, 2015

# EXHIBIT 2

**Tucson Police Memorandum:**
**"Notice of Violation/Notice of Removal"**




## <u>Notice of Violation/Notice of Removal</u>

**Obstructing sidewalks by placing items that prevent the public's full and free use violates Tucson City Code Sections 16-35 and 25-51. Beginning at 10 p.m., Sunday, June 14, 2015, persons who place, allow, or maintain property in violation of the above ordinances after the above-stated time are subject to citation and prosecution.**

Sec. 16-35. Obstructing streets, alleys or sidewalks prohibited.

No person shall obstruct any public sidewalk, street or alley in the city by placing, maintaining or allowing to remain thereon any item or thing that prevents full, free and unobstructed public use in any manner, except as otherwise specifically permitted by law.

Sec. 25-51. Obstructing sidewalks prohibited; placing benches on sidewalks.

No person shall obstruct any public sidewalk in the city, by placing, depositing or allowing to remain thereon, any boxes, crates, goods, wares, merchandise, hay, grain, farm produce or other thing, or prevent, in any manner, the full, free and unobstructed public use of any of the public sidewalks; however, after approval by the mayor and council suitable benches for the convenience of city residents and visitors may be located upon the public sidewalks with the written approval of the city engineer. Such approval shall be duly filed with the city clerk, shall be cancellable for good cause shown, and may be subject to such requirements and conditions as to type of bench, location upon the sidewalk and otherwise, as the city engineer may deem necessary or desirable in the interest of the public safety and convenience; further, where it is necessary to place garbage and trash containers upon a public sidewalk to allow the removal of such garbage and trash, such containers may be placed upon a public sidewalk for the reasonable period of time necessary for such removal.

**Unattended property left in violation after 10 p.m., Sunday, June 14, 2015, shall be considered abandoned and subject to immediate removal by the City of Tucson.**

OFC/SGT. _____        PR# _____

# EXHIBIT 3

**Occupy Public Land Letter to City of Tucson Dated 6/19/2015**

**Occupy Public Land**
**3054 N. Edith**
**Tucson, Ariz. 85716**

John Thomas Cooper, Jr.
Executive Organizer
Secretarial Working Group
Email: southwestrecords@gmail.com

June 19, 2015

Mike Rankin
c/o Chris Avery
Tucson City Attorney
PO Box 27210
Tucson, AZ 85726
(520) 791-4221
mike.rankin@tucsonaz.gov

In re: Notice of Continued Unconstitutional Conduct

Dear Mr. Rankin and Mr. Avery:

Since the closure of Veinte De Agosto Park (Safe Park) June 14th, the Tucson Police have proceeded to arrest and confiscate the property of homeless individuals on the Downtown sidewalks—to include the sidewalk to the east of Safe Park; which, as you know, is protected by the United States District Court's preliminary injunction. The Police issued a memorandum which stated two City Code Sections as applicable to the conduct of the homeless population with respect to the Downtown sidewalks:

> Sec. 16-35 provides: "No person shall obstruct any public sidewalk, street or alley in the city by placing, maintaining or allowing to remain thereon any item or thing that prevents full, free and unobstructed public use in any manner, except as otherwise specifically permitted by law."

> Sec. 25-51 provides: "No person shall obstruct any public sidewalk in the city, by placing, depositing or allowing to remain thereon, any

boxes, crates, goods, wares, merchandise, hay, grain, farm produce or other thing, or prevent, in any manner, the full, free and unobstructed public use of any of the public sidewalks, . . . "

This memorandum further stated that "unattended property shall be considered abandoned and subject to immediate removal by the City of Tucson."

## DISCUSSION

### 1. Abandoned or Unattended

We have previously had contention with the City concerning whether unattended property is abandoned. In a previous letter we explained that

> the definition of abandoned does not include leaving your property in a particular area unattended. Abandonment is "the act of intentionally and voluntarily relinquishing a known right absolutely and without reference to any particular person or purpose." *Mason v. Hasso*, 90 Ariz. 126, 129, 367 P.2d 1, 4 (1961). A forfeiture, on the other hand, "is enforced and involuntary and occurs without regard to intention." Id. Indeed, even if arrest had been made—which they were not—the government would not be able to simply declare the property abandoned. See, e.g., A.R.S. § 13-904(D) ("The conviction of a person for any offense shall not work forfeiture of any property, except if a forfeiture is expressly imposed by law. All forfeitures to the state, unless expressly imposed by law, are abolished."); A.R.S. § 31-228(A) ("When a prisoner is released on parole or discharged from a facility of the department of corrections there shall be returned to the prisoner everything of value taken upon commitment to the department of corrections, or thereafter received by the prisoner."); *Blum v. State, Dept. of Corrections*, 829 P.2d 1247, 171 Ariz. 201 (1992). See *Lehr v. City of Sacramento*, 624 F.Supp.2d 1218, 1235 (E.D.Cal.2009) (citing *Justin v. City of Los Angeles*, CV 00-12352 LGB AIJ, 2000 WL 1808426, at *9 (C.D. Cal. Dec. 5, 2000)); *Kincaid v. City of Fresno*, CV 06-1445 OWW SMS, 2006 WL 3542732, at *35-37 (E.D.Cal.2006) (issuing a preliminary injunction after holding that "[t]he City's seizure of homeless people's personal property without probable cause and the immediate and permanent destruction of such property without a method to reclaim or to assert the owner's right, title, and interest to recovery such personal property

violates the Fourth Amendment to the United States Constitution and Article I § 13 of the California Constitution"). This conclusion is not altered by the fact that the City may have found the property in a public place. See, e.g., *Soldal v. Cook County*, 506 U.S. 56, 68, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) ("an officer who happens to come across an individual's property in a public area could seize it only if Fourth Amendment standards are satisfied—for example, if the items are evidence of a crime or contraband.").

In addition, the District Court in *Cooper v. City of Tucson* agreed with our analysis. In its Order granting our Motion for Preliminary Injunction, the court noted that:

> In the Ninth Circuit, the Fourth and Fourteenth Amendments protect homeless persons from government seizure and summary destruction of their "unabandoned," but momentarily unattended, personal property. *Lavan v. City of Los Angeles*, 693 F.3d 1022,1024 (9th Cir. 2012)."Because homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, the City must comport with [] due process requirements if it wishes to take and destroy them." Id. at 1032.

The court concluded:

> *Lavan* was NOT about a constitutionally-protected property right to leave possessions abandoned on public sidewalks. *Id.* at 1027. The case was about whether homeless persons instantly and permanently lose protected property interests in their possessions by leaving them momentarily unattended in violation of a municipal ordinance. *Id.* The court held they do not, and the City cannot treat "unattended" personal property of homeless persons differently than it treats an unattended car parked in a "no parking" zone. *Id.* at 1032. Under *Lavan*, the City must distinguish between personal property that is abandoned or simply left unattended or in the attendance of another person. Only property that in good-faith appears to be abandoned is subject to seizure. The Court finds the Plaintiffs have shown a likelihood of prevailing on the claim that police are harassing protestors by seizing personal property that is not abandoned...

**IT IS FURTHER ORDERED** that Defendant the City of Tucson is enjoined as follows: (4) Seizing any personal property that in good-faith does not appear to be abandoned.

Accordingly, we again place the City on notice that it is unconstitutional for the City to confiscate property from individuals simply because the property is momentarily unattended or left in the care of another person. Occupy Public Land well use all legal avenues available to prevent the City's pursuit of this course of action.

## 2. Mens Rea and Vagueness.

As stated in the Police memorandum cited above, "[o]bsturcting sidewalks by placing items that prevent the public's full and free use violates [TCC] Sections 16-35 and 25-51." According to several officers we questioned, this means either—(1) Individuals are not allowed to have any property what-so-ever on the Downtown sidewalks; (2) Individuals are allowed a bed roll, backpack, and a beverage (the fact that the District Court ruled the 3-B policy unconstitutional was lost on the two officers who stated this as City Policy);[1] or (3) Individuals are allowed only the amount of property which they can carry in one trip. The fact that these three positions cannot be reconciled evinces the constitutional infirmity of the statutes under question here.

First, both statutes are void for vagueness as they fail to provide a workable definition of the word "obstruction" or the phrase "full, free and unobstructed public use." Section 16-35 states that *"No person shall obstruct any public*

---

[1] We note that Officer Hawkings informed us that the City Attorney's Office told the Police that Judge Bury granted the City's Motion for Clarification and amended his injunction according to the City's request. This is patently false, as you are well aware. We think it need not be stated that the job of the City Attorney's Office is not to provide misinformation or misrepresentations which will directly lead to constitutional violations. Such advice from an attorney would violate Rule 1.2. (d) of the Rules of Professional Conduct, which provides:

> A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

*sidewalk*, street or alley in the city by placing, maintaining or allowing to remain thereon any item or thing *that prevents full, free and unobstructed public use...*" Section 25-51 states "*No person shall obstruct any public sidewalk in the city*, by placing, depositing or allowing to remain thereon, any boxes, crates, goods, wares, merchandise, hay, grain, farm produce or other thing, or *prevent, in any manner, the full, free and unobstructed public use of any of the public sidewalks . . .*" However, as patently demonstrated above, not even two law enforcement officers charged with the enforcement of the City Code could agree on the meaning of these statutes.

As the United States Supreme Court has noted on numerous occasions, "[T]he terms of a penal statute [...] must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties... and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926).

This analysis should come as no surprise to the City, as the District Court in *Cooper v. City of Tucson* warned its attorneys that these laws were precariously written:

> [T]he City misses the important point that it needs the 3-B Policy because obstruction is not defined in the ordinances it seeks to rely on here: TCC §§ 16-35 and 25-51. See *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1155-56 (9th Cir. 2014) (describing statute as unconstitutionally vague if it leaves the public uncertain as to the conduct it prohibits or encourages arbitrary or discriminatory enforcement). "If a statute provides 'no standards governing the exercise of . . . discretion,' it becomes 'a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Id.* (quoting *Papachristou v. Jacksonville*, 405 U.S. 156, 170 (1972)). Except for the express 5 foot/8 feet standards provided for in TCC § 11-36.2(b)(4) when the sidewalks are being used in the daytime for First Amendment activities, the TCC sidewalk ordinances contain no standards nor definition for "obstruction." The City ignores an express standard, provided by the City Council for applying to all First Amendment activities conducted downtown during the day, in

favor of defining "obstruction" pursuant to the 3-B Policy, which appears uniquely tailored to homeless people.

Second, the failure to include a *mens rea* component in TCC Section 16-35 renders the statute and its application nearly indistinguishable from the law invalidated by the United States Supreme Court in *Cox v. Louisiana*, 379 U.S. 536 (1965). In *Cox*, the Court was faced with the following statute:

> "No person shall willfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein."

La. Rev. Stat. § 14:100.1 (Cum. Supp. 1962). The Court noted the lack of a *mens rea* in the statute rendered it susceptible to abuse. The Court stated:

> [t]he situation is thus the same as if the statute itself expressly provided that there could only be peaceful parades or demonstrations in the unbridled discretion of the local officials. The pervasive restraint on freedom of discussion by the practice of the authorities under the statute is not any less effective than a statute expressly permitting such selective enforcement. A long line of cases in this Court makes it clear that a State or municipality cannot "require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be . . . disseminate[d] . . . ." *Schneider v. State, supra*, at 164. See *Lovell v. Griffin, supra; Hague v. CIO, supra; Largent v. Texas, supra; Saia v. New York, supra; Niemotko v. Maryland, supra; Kunz v. New York, supra*.
>
> This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor. See *Saia v. New York, supra*, at 562. Also inherent

in such a system allowing parades or meetings only with the prior permission of an official is the obvious danger to the right of a person or group not to be denied equal protection of the laws. See *Niemotko v. Maryland, supra,* at 272, 284; cf. *Yick Wo v. Hopkins,* 118 U.S. 356. It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power *or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.*

*Cox v. Louisiana,* 379 U.S. 536; 85 S. Ct. 453; 13 L. Ed. 2d 471 (1965) (emphasis added). See also *Bachellar v. Maryland,* 397 U.S. 564, 571, 25 L. Ed. 2d 570, 90 S. Ct. 1312 (reversing convictions of anti-war protesters where the record left open the possibility that their arrests were content-based, but noting "petitioners' convictions could constitutionally have rested on a finding that they sat or lay across a public sidewalk with the intent of fully blocking passage along it, or that they refused to obey police commands to stop obstructing the sidewalk in this manner and move on.") (emphasis added).[2]

---

[2] A statute may be so vague or so threatening to constitutionally-protected activity that it can be pronounced wholly unconstitutional; in other words, it is "unconstitutional on its face." *Papachristou v. City of Jacksonville,* 405 U.S. 156 (1972); *Smith v. Goguen,* 415 U.S. 566 (1974). Generally, a vague statute that regulates in the area of First Amendment guarantees will be pronounced wholly void. Winters v. New York, 333 U.S. 507, 509–10 (1948); *Thornhill v. Alabama,* 310 U.S. 88 (1940). Moreover, an ordinance making it a criminal offense for three or more persons to assemble on a sidewalk and conduct themselves in a manner annoying to passers-by was found impermissibly vague and void on its face because it encroached on the freedom of assembly. *Coates v. City of Cincinnati,* 402 U.S. 611 (1971). See *Shuttlesworth v. City of Birmingham,* 382 U.S. 87 (1965) (conviction under statute imposing penalty for failure to "move on" voided); *Bouie v. City of Columbia,* 378 U.S. 347 (1964) (conviction on trespass charges arising out of a sit-in at a drugstore lunch counter voided since the trespass statute did not give fair notice that it was a crime to refuse to leave private premises after being requested to do so); *Kolender v. Lawson,* 461 U.S. 352 (1983) (requirement that person detained in valid Terry stop provide "credible and reliable" identification is facially void as encouraging arbitrary enforcement). Similar concerns regarding vagrancy laws had been expressed previously. See, e.g., *Winters v. New York,* 333 U.S. 507, 540 (1948) (Justice Frankfurter dissenting); *Edelman v. California,* 344 U.S. 357, 362 (1953) (Justice Black dissenting); *Hicks v. District of Columbia,* 383 U.S. 252 (1966) (Justice Douglas dissenting).

The same problems noted by the Court In *Cox* and *Bachellar* exist with respect to TCC Sections 16-35 and 25-51. Because the phrase "full, free and unobstructed public use" is unqualified by the intent of the actor, the personal predilections of individual officers is all that gives the law any standard. Who's to say when an individual is not *objectively* preventing the "full, free and unobstructed public use" of a sidewalk when the City's attorneys admit to a Federal Court that an individual stopped with a roll-along brief case is an obstruction? Such standardless enforcement places all citizens in the Downtown area at risk of arrest.

"A legislature must establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U. S. 566, 574 (1974). Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.*, at 575.[3] This result is patently unconstitutional, and Occupy Public Land will take legal action to prevent the further enforcement of these laws against the homeless. The City of Tucson may not empower its Police "to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969).

### 3. Conclusion.

Accordingly, we have clearly demonstrated that the City has utterly failed to abide by the Constitution of the United States in its continued war against the impoverished and disenfranchised. Although Tucson may not be constitutionally obligated to establish and maintain a public park or sidewalk system, it has nevertheless done so and has required its citizens to abide by said statutes. The authority possessed by the City to prescribe and enforce standards of conduct in its

---

[3] This concern for minimal guidelines finds its roots as far back as the decision in *United States v. Reese*, 92 U. S. 214, 221 (1876):

> "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government."

streets and parks—although concededly very broad—must be exercised consistently with constitutional safeguards. We agree with the Supreme Court that it is the role of the "political branches to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

City officials cannot be allowed to violate the Constitution of the United States with impunity. The Tucson City Government is required to take action to insure to its citizens a republican form of government, which adheres to the Constitution and laws of the United States. The City's actions in failing to discipline its officials for violations of the Federal Constitution puts the City in the untenable position of aiding and abetting federal criminals, as 18 U.S.C § 242 makes it a Federal crime for anyone under color of any law, statute, ordinance, regulation, or custom; to willfully subject any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

Cordially,

*J. Thomas Cooper, Jr.*

John Thomas Cooper, Jr.
Occupy Public Land
Executive Organizer
Secretarial Working Group
3054 N. Edith Bvld.
Tucson, Ariz. 85716
Email: southwestrecords@gmail.com